NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 15, 2013[*]
Decided April 30, 2013

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 12-2259

| | |
|---|---|
| JEFFREY ALLEN ROWE, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Indiana, |
| | South Bend Division. |
| *v.* | |
| | No. 3:10cv249 |
| HOWARD MORTON and PAMELA BANE, | |
| *Defendants-Appellees.* | William C. Lee, |
| | *Judge.* |

**O R D E R**

Jeffrey Rowe claims in this suit under 42 U.S.C. § 1983 that prison administrators Howard Morton and Pamela Bane failed to protect him from another inmate. The district court granted summary judgment for the defendants. We uphold that decision.

We review evidence adduced at summary judgment in the light most favorable to Rowe. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013). Rowe was transferred to

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

Indiana State Prison in March 2010. Before that he was housed at Pendleton Correctional Facility, where he and another inmate, Randall Hash, purchased drugs on credit from two gangs, the Latin Kings and the Gangster Disciples. When Rowe arrived at ISP, members of those gangs sent word that he was expected to settle Hash's drug debts as well as his own.

Rowe sought protective custody from Bane, who is responsible for fielding such requests in Rowe's unit. He told her of his debts to the gangs, that the Gangster Disciples had placed a "hit" on him, and that Glenn McKnight, a Gangster Disciple who previously assaulted him at Pendleton, was spreading word around the prison that he was a "snitch." He also noted that a Latin King named Ayon was trying to provoke a third gang, the Aryan Brotherhood, to attack Rowe by saying he was a cooperator. A member of the Aryan Brotherhood had warned Rowe that he would be attacked if he could not clear up that accusation.

Bane declined to assign Rowe to protective custody but offered to put him into administrative segregation, which would stop other inmates from entering his cell and allow him to exercise alone. Although administrators at Pendleton had removed Rowe from their protective custody unit after learning of his membership in a gang called "White Supremacy" (gang members are generally excluded from protective custody), Bane did not cite that situation as a reason for keeping him from protective custody at ISP. Rowe insisted that Bane's offer was inadequate because gang members still could attack him with fluids—scalding water, grease, or diseased bodily fluids—through the bars of his cell. Bane was not persuaded. She assigned Rowe to administrative segregation, denied his request for protective custody, requested that he be permanently separated from McKnight, and flagged the case for the prison's Internal Affairs unit to investigate further. Rowe appealed this decision to Morton and repeated his concern that other inmates could assault him with fluids. Morton approved Bane's decision.

One month after Rowe was placed in administrative segregation, a Latin King called "Chano" came to his cell and spoke to him through the bars. Chano conveyed a demand for payment from Ayon, but Rowe insisted that he had no money. Chano left and returned with "boiling hot" water, which he threw onto Rowe. Rowe does not say how much water Chano threw or what Chano used to carry the water. Rowe asserts that he suffered minor burns which left him in "excruciating pain" for two days (though he did not report the attack to Internal Affairs, or seek medical attention, and the burns healed without scarring or even blistering). Rowe adds that he also suffered "significant mental and emotional injuries," which he does not describe except to say that he was "pretty scared" after the attack and had difficulty sleeping.

Rowe sued Bane and Morton, claiming that both had violated the Eighth Amendment by not moving him to protective custody. During discovery Rowe asked the defendants to produce all reports concerning assaults with liquids at ISP since they began working there, any reports that Internal Affairs prepared after his request for protective custody, and information about the gang membership of the prisoners housed near Rowe's cell at the time of the attack. The defendants objected that complying with these requests would be too burdensome and could create security risks, and the district court denied Rowe's motion to compel production. The court seconded the defendants' concerns and also noted that the information requested was, at best, marginally relevant to Rowe's case.

Rowe also requested that the district court recruit counsel and submitted four letters from lawyers who, over the previous two months, had declined his request for pro bono representation. Rowe insisted that indigency prevented him from contacting more attorneys because the prison provided him with only two prepaid envelopes per month. The court denied this request as well, reasoning that Rowe's suit already was 12 months old, and thus he could have contacted as many as 24 attorneys.

In granting summary judgment for the defendants, the district court reasoned that Bane could not have been deliberately indifferent to the possibility of Chano's attack because Bane did not know who Chano was, and because Rowe had conceded in his deposition that the specific debt which led to the attack was one that arose *after* Rowe spoke with Bane. Furthermore, the court said, the evidence established that Bane was not indifferent to the threats Rowe *did* outline. She took several steps in response, and the fact that these efforts did not thwart Chano's attack proves, at most, negligence. And since Morton had no more information than Bane did, neither could he have been deliberately indifferent. On appeal Rowe principally challenges this ruling, as well as the denials of his motion to compel and his request for appointment of counsel.

We uphold the grant of summary judgment on an alternate ground, namely causation. Rowe's failure to produce evidence suggesting that he would have been safe from Chano or another member of the Latin Kings if he had been placed in protective custody is fatal to his suit. Rowe did not seek any form of protection beyond assignment to protective custody, but Bane has testified by affidavit that protective custody and administrative segregation differ in only two significant ways: (1) inmates in administrative segregation are not allowed to wander freely around their unit, and (2) inmates in segregation are handcuffed while being escorted outside of their cells, and those in protective custody are not. Rowe did not contradict that testimony, and he concedes that entering protective custody carries serious risks: A prisoner who does so will be disowned and targeted for assault or murder by his own gang. If being in protective custody would not have shielded Rowe from Chano or from assaults with liquids (and there is no evidence

that it would have), then the refusal to house Rowe in protective custody could not have been the cause of his injury, and the district court did not err in granting summary judgment.

We also conclude that the district court properly exercised its discretion in denying Rowe's discovery requests. To establish error Rowe must show that the limited discovery caused substantial prejudice. *See James v. Hyatt Regency Chi.*, No. 12-1511, 2013 WL 514097, at *7 (7th Cir. Feb. 13, 2013). He does not challenge the defendants' contention that his request for all reports of assaults committed with liquids during their tenures would require a search encompassing 30 years of records. It was not unreasonable for the court to conclude that this request was unduly burdensome. Nor was his case prejudiced by denying him access to information about the names and gang affiliations of his neighbors: He offers no explanation why this request would be likely to produce evidence relevant to his deliberate-indifference claim. Finally, the defendants did not ignore Rowe's request for documents about the Internal Affairs investigation; they told the district court that they had provided all responsive documents. Rowe has not provided any reason for the district court to disbelieve this statement, which would be sanctionable if untrue. *See* FED. R. CIV. P. 37(a).

As for the district court's refusal to recruit counsel, even if we should conclude that expecting him to contact more attorneys was unreasonable (Rowe cites no authority on this point and simply notes that other judges have required fewer letters), we cannot find a reasonable likelihood that his case was prejudiced. *See Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007) (en banc). We look to the difficulty of the case and the plaintiff's competency to litigate it. *Santiago v. Walls*, 599 F.3d 749, 762 (7th Cir. 2010). Rowe's case is not complex: His claims do not require expert testimony and do not involve a large number of defendants or claims. *See Wheeler v. Wexford Health Sources*, 689 F.3d 680, 683 (7th Cir. 2012); *Santiago*, 599 F.3d at 762. Moreover, Rowe appears capable of handling civil-rights litigation on his own: In this suit alone he aggressively conducted discovery, fended off the defendants' attempt to convince the court that he had incurred three "strikes" under 28 U.S.C. § 1915(g), and forced the defendants to abandon a nonexhaustion defense. His extensive litigation history—he has filed 22 civil-rights complaints or petitions for habeas corpus since 2004—suggests that these successes were the product of experience rather than blind luck.

We have reviewed Rowe's remaining claims and conclude that none has merit.

Accordingly, the judgment is AFFIRMED.